Your Honor, I am counsel for the A&C Healthcare Company. And just to give you a little background of what is at issue here, this is really a bankruptcy case masquerading as a labor relations case. The Labor Board doesn't really seem to recognize the fact that the bankruptcy court had a great deal to do with the terms and conditions that were offered to employees. And so that causes some confusion, because our client purchased the facility, A&C, and in a bankruptcy situation. Now, the bankruptcy court made very clear rulings about who was supposed to do what. Our client became what they call an operator, not an owner. No ownership interests whatsoever. Until such time as the facility acquired all of the necessary licenses and permissions, very stringent inspections by the State. And what was the date upon which your client became the operator? On the third, I think, what was the date? Sometime in July in 2007. Might have been July 6th. Is that right?  That sounds right. So anyway, the complications of this case are the fact that the bankruptcy court provisions were never integrated in any sense with the Labor Board provisions. And as a matter of fact, not even recognized by the Labor Board. And what further complicates this case is that the owner of the facility, the purchaser of the facility, had no official standing, was not empowered to do anything, essentially, except manage, so to speak, until and unless he was granted all of the terms and all of the licenses that are extensive, whole slew of licenses, because they handle millions of dollars for very aged and ill people, basically indigent. And when did that happen? Say again? When did that happen? When did your client receive all the licenses it needed to go forward? About December, I think December 5th. So my notes indicated that on July 6th, A&C purchased the facility. On August 8th, they assumed operation of the facility. So I take it that's the start of the 90-day probationary period? And you're telling me that the licenses weren't finally received until December, is that right? That's correct. Now, that complicated things considerably, because if he hadn't been... Can I interrupt? Yes. This is on the question of – hang on a second. We won't – this won't come against your time. We've got to – okay. The extraneous noise is now gone. Here's my question. Whoops. I don't know what the noise is. Okay. Here we go again. To the extent that this is coming out of your time, don't worry about it. I don't see that the December date for obtaining the final licensing is relevant here. The question is, at what point is your client taking over a continuous operation and at what point does your client know or have real reason to expect that a majority of the employees will stay on? That is to say, you don't contend that you had no obligation to bargain after November 8th. On November 8th, do you? I think I was not clear. On November 8th, that's when you end up hiring 79 out of the 85 employees who had been probationary up until that point. Our position was this. If the owner at that point failed to get the necessary licenses, and it was very shaky by that time because he only had until the end of the year, at which time the whole place would revert back to the bankruptcy court. He did not have, under the very explicit terms of the bankruptcy language of the bankruptcy court, he had no authority to enter any kind of relationships like that. He was simply a manager. That doesn't make sense to me, given what I see that went on here. That is to say, you offered and got acceptances from an employment of 79 employees on November the 8th. On December. November the 8th. November. At the end of the 90-day probationary period. Isn't that correct? They were offered, yes. But they were they understood, of course, that if he left, they left. I assume they left. They must understand that. They understand that. But I'm responding to your assertion that your client had no authority to do anything until after the necessary licenses were obtained. That's right. But they obviously did something, because on November 8th, they offered jobs to 79 people. Because they had to continue operations, of course. And they announced new terms and conditions of employment on November 8th. That's right. But all of that was contingent upon the fact that, in fact, our owner would become licensed to do what needed to be done. If he didn't become licensed, then he would go, I mean, it would revert back to the original Pleasant Care Corporation or whatever entity was controlling their affairs, and they would go away. And it was not at all certain, because that was a, that was a, you know, there were tons of licenses and tons of. And that brings me back to the question I tried unsuccessfully to formulate. As of November 8th, at which date you now have 79 employees that have accepted, on that date, has there been a Burns succession? Not in the sense that Burns. I don't think there was a Burns succession then. Until it was clear that he was the owner. Until it was clear that title had passed. It was until it was clear that he, that. That strikes me as an argument that I've never read before. I mean, is this argument. I don't see that. Is this argument addressed in the NLRB ALJ decision? Where's this argument coming from? Maybe I don't understand your question. Well, the way the ALJ sets up his decision. Yeah. Is that, in his view, it's unquestioned that at November 8th, because at that point, we have 79 of the 85 employees hired by your company. That at that point, it's clear that you are a successor company. And the ALJ is trying to decide at what point prior to that, if any, were you a successor company under Burns. And you're telling me you weren't even a successor company on November 8th, after you hired 79 people. Well. Maybe that isn't what you're meaning to tell me. I mean to tell you that it's not at all, it was not at all clear at that time whether the management of this company would be there after the, after December 31st. No, I understand that. But I'm asking a different question, and that is, at what point is it clear that your company is a successor company? And the ALJ assumed, and it appears that that was not disputed, that as of November 8th, when the 79 employees were no longer probationary, that you were a successor company. Yes, I think that's a fair statement. Okay. So the December later date seems to me irrelevant to this argument. Well, it became irrelevant because they did, in fact, close the deal. Anyway, our concern here has been the fact that the, there's a vast distinction between the terms that were imposed by the bankruptcy corporation, bankruptcy court, which said in many different places, and I can quote them on page 29 of the transcript, other pages, that our client was not a successor of the debtors. Not. No qualms about that. And shall have no successor liability as a result of purchasing any of the debtors' facilities. And that's upon the statement and the understanding upon which the company relied, not successors. Now, the problem was complicated by the fact that the ALJ, hearing this case, made no reference whatsoever at all to the terms and understandings that had developed out of the purchase of this company. It was just silent about it completely. And so that left the area for a lot of confusion. Our own view was that once he, once it was clear that the hospital was, in fact, transferred, once that had happened about the first week of December, and in the last, actually the last month that it could have happened, that we met and bargained with the union, began the bargaining. So there wasn't any hiatus there. There wasn't any, in other words, nobody was sandbagging the union. Let me ask you, let me ask this, if I may. The premise of the ALJ's decision, which was then affirmed by the NLRB, is that at some point prior to November 8th, it was apparent to your company that it would have at least a majority of the prior employees working in its employ on November 8th. Right. How is that wrong? It seems to me almost inconceivable that the ALJ is wrong on that point when you end up hiring 93 percent of them, and the criterion for burned succession with respect to how many employees you need is that there be a majority. And the question then to take the ALJ's position in a way that I think sort of pushes it out to the maximum available to the ALJ. Well, let me ask you this. On November 7th, the day before you make the offers and so on, it seems to me that there is substantial evidence to support the ALJ's conclusion that you had a pretty good idea that you would have a majority of the employees continuing. That's right. We had no idea that we would be in business any further. But that's a different question. Excuse me. I couldn't hear your response. Forgive me. But you had no idea what? I had no idea whether or not we'd even exist, because that was completely in the air. Counsel Judge Gould, if I could interject a question. Yes. Oh, yes. My voice is probably just up in the air. You can probably see me. Okay. I understand that a good part of the thrust of your argument is that because your client didn't have the licenses, the whole relationship could be unwound. Correct. But it seems to me the legal issue is until that happens, does your client have to bargain with the union? If they're a Byrne successor, they can't change the employee standards or wages without talking to the union, even though they might disappear and be gone the next month if they get the licenses. So I kind of have the same issue that I think Judge Fletcher is raising, that if on November 8th they make permanent employment offers to a whole bunch of employees, more than 80, wasn't there somebody there? Logically, didn't there have to be somebody, company, who on November 7th or November 6th would have had a piece of paper analyzing which employees they were going to make offers to and who they weren't going to make offers to? Well, that's possible. The problem was, Your Honor, that there weren't any funds. Our client was, quote, just a manager, that's all. He had no authority with respect to the bankrupt funds. He had never met the people who owned the facility. He was just a mere operator. He wouldn't have any way of negotiating. He had no power to negotiate with the employees, no power to establish any terms and conditions with them, because if he, in fact, disappeared because he failed to get the licenses in a matter of a week or two, who would know or how would you decide what the terms and conditions would be for another incoming manager, according to the bankruptcy court, a week or two or a month later? In other words, there was complete, wide-open insecurity of what was going to happen until he had licenses in hand and he could create the conditions. But, counsel, your client issued new terms and conditions of employment on November 8th before licenses were in hand. Those were terms and conditions so that there would be something to start with. They had to have some kind of they were completely open to negotiations, but there had to be something to put on the table once their 90-day period had expired. And during the 90-day period, they were simply earning wages, no fringe benefits or any other. That was the condition of their 90-day employment. At the end of that time, because that had expired, the other terms and conditions were put in, but they were acknowledged to be simply kind of a holding position until we found out who was going to own this facility, and at which time, and when they did, we immediately sat down with the union. There wasn't any sandbagging at all. And that acknowledgment is where? Acknowledgement of? You said they were acknowledged to be a temporary holding position. Where was that acknowledged? How was it acknowledged? That was, that was, well, I was negotiating at that time, and I made it very clear that we had to have some terms and conditions, and I put them on the table, and they accepted them, and we discussed them. So it was an odd situation because there were so many uncertainties. One, it was really a bankruptcy situation. Two, there was nothing in the labor board's position that even acknowledged that it was a bankruptcy situation. Three, the attempt to get licenses for the owner so that we could close were not going well and taking forever, and we were up very close to the end, in which case it would all evaporate and we'd all go away. So it was a, I'm not aware of any similar situation, but it was a, it was a very difficult and tenuous situation. Nobody attempted to take it, certainly, I don't know, but we certainly, the management did not attempt to take advantage of the situation. There was nothing we could do. Okay. You're over time. Let's hear from the government, but we'll make sure you get a chance to respond. Thank you, sir. May it please the Court, Ruth Burdick, appearing for the National Labor Relations Board. Closer to the mic. Is this better? The mic is recording, but just speak up a little bit. Okay. Thank you. I didn't want to be too loud. I'd just like to begin with some rebuttal points immediately, just to straighten  First of all, I would like to begin by saying that I think it's very important As the Board noted in its brief, footnote 5 on page 25, in its opening brief, the company waived all bankruptcy and licensing arguments it had raised before the Board. It did not present those to the Court, and therefore, they're waived. With regards to bankruptcies in general, the acts of an employer who succeeds a predecessor in the union in labor context is different, and the successorship in a bankruptcy proceeding is a different definition with different requirements than successorship in the labor context, and my opposing counsel seems to be attempting to blur those lines. With regards to the operating agreement, my opposing counsel just actually made my point for me by saying that he presented terms to the predecessor that he wanted to initially hire the employees under, which was probation, which is an important very, very important fundamental change to their terms and to go with their health care and other benefits. It put them, as I say, on the probationary period. He presented those terms to the predecessor, and they were negotiated into the operating agreement. The Bankruptcy Court did not impose these terms on the company as they wished to have this Court understand. That's just simply not the case. And I gather that there's no challenge to the ability of A and C to impose those conditions during the probationary period. In labor law, when a — just to be clear, in labor law, when an employer assumes a successorship position such as here, they have the ability generally to impose initial terms. Initial terms here were imposed initially when the operations began back on October 8th and involved the probationary period and the takeaway of health care. And even August 8th? Excuse me? August 8th. August 8th is the date that they assumed operations of. I think you just said October 8th. Oh, I'm sorry. I'm confusing my little timeline here further, so I just want to be sure. My throat's very dry this morning for some reason, so I might be. Okay. You meant August. August 8th.  Thank you. And at August 8th, they put in place those initial terms, which is something they would like to have you believe didn't happen until August — November 8th. Excuse me. And here I just want to say that even if we were to look at bankruptcy, bankruptcy — I can only speak to the cases that have been in the brief so far, and this Court's case in Bellingham is a case that involved a bankruptcy. And there, neither the board nor the court considered the bankruptcy proceedings to be any part of the decision. Here we have a successor employer who assumed operations, and at that point, its actions were its own. And as I said, they negotiated those terms with a predecessor to begin the initial terms for the employees. With regards to initial terms, okay, I did clarify that it was August 8th that they made those, and they were free to do so. And with regards to bargaining, there's a few other factual issues I'd just like to straighten out. It wasn't until January 3rd that the company recognized the union, and it wasn't until January 8th that they sat down with the union to negotiate. And here we have a situation where the main inquiry about when the bargaining duty arises is really from — more from the employee's point of view than from the employer's point of view. And the particular policies that need to be balanced, and the reason why in these transitions you'll have periods that the duty rises instead of an exact date, is as a gradual changes. Usually when a successor takes over a business, there will, particularly in a bankruptcy context, there will be problems with the business that need to be addressed, such as in the S&F market case where the predecessor — I'm sorry, excuse me — the immediately put in place initial terms knowing that they needed to make great staffing changes. Here, the watchword for this case is stability. There were no such concerns in this unit. It was clear that the employer wanted to avail itself of the abilities of the existing staff. When did that become clear? Well, the ALJ finds that it was during the period following the union's first request for bargaining on September 14th and somewhere before November 8th. Right. So this is my problem. Yes. It seems problematic on a going-forward basis that we would look at the end of the probationary period backwards and decide that a duty to bargain, to recognize the union, arose at some point back there a few months back. How is an employer to know going in when that does or does not arise? And this is — and I appreciate the question. This is what I was trying to get at. Oh. Here there was no — as an initial matter, no indication that there was huge staffing issues as in S&F market. There was no plans for a great expansion or contraction. And those are the reasons why occasionally in labor law you'll have to delay the employee's right to their union representative and the benefit. Okay. So when we look at those factors — and I promise I'll stop interrupting here in a minute. That's fine. That's fine. So when we look at those factors, we have to look for substantial evidence. That's correct. So where in the record do I look to find that there was no indication that there was big labor problems there? I don't know that. Or no problems, plans to expand. Part of our problem is, in this case, a very small number of stipulated facts. And so we have basically stipulated facts here rather than a full fact-finding and hearing. But here it's very clear no employee left prior to November 8th. No employee was hired into the unit prior to November 8th. There was no plans for expansion or contraction. And there was no indication — excuse me, Your Honor — that there was any staffing issues of great import. Was there a stipulation that the employer didn't have plans to expand or to change the nature of the operations in any significant way? I don't remember if that's an exact — I know that ALJ found that in his decision. I don't know if there was an exact stipulation to that, but there's definitely now no stipulation that there had been plans for positive. Right. But we have to look for substantial evidence, right? Yes, that's correct. That's my problem. So you want to respond to that. Yes. And here, with regards to that finding, this case is so unusual and the unit is so unstable compared to most of these cases. The little needs to actually be proved other than that no employee left, no employee was hired, there was no expansion or contraction. And there was just simply no plans to make any overall large changes to the unit. Therefore, the — I mean, literally, they would have to have had plans or thought that over 50 percent of their staff would not pass probation. If an employer is evaluating employees during a 90-day period, there will be some indication during that period that they're heading towards not offering a permanent status to somebody. And I would like to go back to a point that Judge Fletcher had targeted in that. On November 8th, even if — okay, that was the date where they made the final permanent offers to employees and then made their first set of unilateral changes without bargaining. Even if we looked at early on November 8th before they handed out the notices, they knew at that time before they issued the unilateral changes that the majority, actually 93 percent of the unit, were former employees of the predecessor. It makes no sense whatsoever, even if you — even if you look at that very late date, to simultaneously or on that same day hand out permanent offers and unilateral changes. So what I'm understanding — Going for, well, 93 percent were former. So I'm understanding your answer to my question about where's the substantial evidence, to be that all the ALJ really found is that at some point prior to November 8th, they must have known, because on that date, they all of a sudden, if you will, hired — That's my reading of the decision. Okay. And again, I apologize. We — I would prefer to have a full record here for hearing, but the parties chose to proceed on a stipulated record. Let me ask you this just as a practical matter. Let's assume that on November the 7th, the company recognizes that it is now a Burns successor company because the likelihood of continuing not only the operation, but a majority of the employees is sufficiently high. On November 8th, they issue the offers and whatever the number is, 79 employees and 93 percent of the employees accept. At that point, what are they supposed to do not with respect to bargaining? I understand that your position is that they're supposed to bargain with the union, but the bargaining is not going to sort of come to fruition on the evening of the 8th. What do they do in the meantime in terms of the conditions in terms of employment while that bargaining is going on? Well, as a legal matter, they can't make unilateral changes. So the conditions, the initial terms that they set on August 8th will continue. So they just stay with those August 8ths, so no health care and so on. That's correct. Those aren't very nice conditions, but they stay. They stay. And you'll notice that the board's order, this is true in all labor cases, and the remedy here is to restore the terms and the conditions that were — that the employees were working under prior to November 8th and rescind those changes upon request of the union. And there's always a bargaining request trigger in these situations. Excuse me. I'm having a terrible time with my throat. But there's always — there's always that component upon request of the union, and that's one of the reasons here that no matter what the facts of the case might have been, here we have a union that didn't request bargaining until September 14th, and that's a trigger. And that's a trigger. I mean, when a company wants to make unilateral changes, they have to give notice to the union and an opportunity to bargain. And that's not our exact situation here, but it illustrates the fact that the union could choose not to bargain. Here, under the board's continuing request rule, which was adopted in Fall River, once the union has requested it, that request continues until they come to the table. I'm not sure if that helps. No, that helps. Thank you. And I'd just like to emphasize very briefly, if I have — oh, good. I have time. That in the reply brief, a company is still making this notion that — making the argument on the notion that the probation period needs to close before it can become a burn successor. Well, first of all, it's never disputed as a burn successor. It's just disputed when its bargaining duty has arisen. And with regards to probation, their argument is simply unsupported by evidence. And the board's cases, brief at page 21, illustrate that and includes cases of this circuit, or at least an enforcement also of the Sahara case. And very importantly, as a global point, I'd like to make clear that, in essence, this argument is nothing more than the full complement standard that was rejected by the Supreme Court in Fall River, footnote 14, where they make clear that the time for measuring majority status need not be when all employees have been hired. This is essentially the company's argument with regards to probation, and it's been rejected not only in Fall River, but by this Court in premium foods, in which this Court recognized that the count for majority need not be delayed until the employer has completed hiring of all employees. To me, this is — just deadens the point that they're attempting to make. And again, the policies in play in determining the tension of when their duty arises is really painted in terms of the employee's right to not have too much delay and its right to have the benefit of its bargaining representative, against the policy of making sure enough of a majority, a substantial and representative complement is present, not the full complement, but a substantial representative complement so the majority status can be determined properly. And with regards to the operating agreement, I believe I addressed that to say that, you know, they negotiated those terms and, in fact, presented them. And I think it's important to note that the company's actions were its own when it assumed operations of the facility on August 8th, and its actions were its own. And part of labor law does not look like to the successorship standards that are in bankruptcy. Are there any further questions? I think not. No. Thank you. Thank you.      If there are no further questions, I think we can adjourn at this point. And the Board requests that its order be enforcement full. Would you like two minutes to respond? Yes, a couple of points. The, again, what the Board continually ignores, and it's a very important fact, is that this whole procedure was taking place in the context of a failed company and a bankrupt company, and on top of that, that the Bankruptcy Court had made very specific provisions about how this was all going to happen. Nothing in the NLRB record even suggests that they recognized that the Bankruptcy Court had anything to say about this. Now, obviously, this company had a lot to learn. I mean, we, our future depended not on the Board as much as it did on this Bankruptcy Court. If the Bankruptcy Court said, you're out of here because you haven't complied with what we want you to do, we're out. We were only managers, only managers until all the licenses had been received. This is not, in Fall Rivers, any of those cases are like that. They're not like that. This is not a situation where everybody knew who the employer was, who the employer was going to be, and what was going to happen between now and then. We didn't know, and there was a lot of nail-biting going on towards the beginning of December about whether or not we were going to be there at all. And if we weren't, we'd just all disappear like little elves. We were not in a position, we were not in a position to make the kind of assurances and promises and representations that normally occur where you have an ongoing business, where a person buys a company, he knows he's going to own it, and he can be held to very certain kinds of standards. This may or may not be. I raise this without citing the footnote. The NLRB lawyer cited the footnote five in the red brief saying, you didn't brief this in front of us. This is to say that this is really a bankruptcy case and the fact that it's bankruptcy makes all the difference. Did you brief this to us? I was under the impression we had, but I could be corrected on that. Okay. But it's a matter of public, I mean, it's a public record. A lot of, there's a lot of legal, a lot of legal ink spilled over this issue. But it was a key issue. It wasn't a question of what, we didn't know, there wasn't going to be a company for people to come to work at if that final license, which occurred, I think, on December 5th. No, no, we understand the point. We didn't get that. We understand the point. Yeah. I'm sorry to emphasize it so much, but there's a lot of nail-biting going on about that thing. Okay. Thank you very much. Thank you. Thank both sides for your arguments. NLRB v. A&C Healthcare Services now submitted for decision. We will take a five-minute recess and we will reconvene to hear argument in the last case, the Johnson case. Thank you. Thank you.
judges: Fletcher, Gould, Christen